# EXHIBIT A

EXHIBIT A

COPY

1 | Andrews & Thornton
2 | 2 Corporate Park, Suite 110
Irvine, California 92606
3 | Phone: (949) 748-1000
Facsimile: (949) 315-3540
4 | Anne Andrews, Esq., SBN 103280
aa@andrewsthornton.com
5 | John C. Thornton, Esq., SBN 84492
jct@andrewsthornton.com
6 | Sean Thomas Higgins, Esq., SBN 266888
shiggins@andrewsthornton.com
7

8 | Attorneys for Plaintiff-Decedent

2013 FEB 13 FILED

CL...
SAN D...
FEB 13 '13 AM 10:12

9 | SUPERIOR COURT FOR THE STATE OF CALIFORNIA 

10 | COUNTY OF SAN DIEGO

11 | LEANNE SPARLING and MICHAEL J
SPARLING, on behalf of and as
12 | representatives for MICHAEL L SPARLING,
deceased,

13

14 |                     Plaintiffs,

15

16

17 | v.

18

19 | USPLABS, LLC, JONATHAN VINCENT
DOYLE (an individual), JACOB GEISSLER
20 | (an individual), USPLABS JACK3D, LLC,
USPLABS HOLDING, LLC, GNC
21 | CORPORATION, NATURAL
ALTERNATIVES INTERNATIONAL, INC.,
22 | and DOES 1-500, Inclusive,

23 |                     Defendants.

No. 37-2013-00034663-CU-PL-CTL

COMPLAINT FOR DAMAGES AND

DEMAND FOR JURY TRIAL

1. Negligence
2. Strict Products Liability — Defective Design
3. Strict Products Liability — Failure to Warn
4. Breach of Express Warranty
5. Breach of Express Warranty
6. Breach of Implied Warranty
7. Unlawful Business Acts and Practices in Violation of California Business and Professions Code §17200 et seq.
8. Punitive Damages
9. Wrongful Death

24

25

26

27

28

- 1 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  Plaintiffs LEANNE SPARLING and MICHAEL J SPARLING, on behalf of and as
2  successors/representatives for MICHAEL L SPARLING, deceased, by and through their Attorneys
3  of record, bring this action against Defendants USPLABS, LLC, JONATHAN VINCENT DOYLE
4  (an individual), JACOB GEISSLER (an individual), USPLABS JACK3D, LLC, USPLABS
5  HOLDING, LLC, GNC CORPORATION, NATURAL ALTERNATIVES INTERNATIONAL,
6  INC., and DOES 1-500, (collectively, "DEFENDANTS"). Plaintiffs allege on information and
7  belief, except for information based on personal knowledge, as follows:

**JURISDICTION AND VENUE**

8  1.  Plaintiffs allege an amount in controversy in excess of the minimal jurisdictional
10 limits of this Court.

11 2.  Venue is proper since at least one Defendant can be found in this County.

**DEFENDANT PARTIES**

13 **I.  Product Manufacturers**

14 3.  Defendants USPLABS, LLC, USPLABS JACK3D, LLC, and USPLABS HOLDING,
15 LLC are Wyoming corporations (except as to USPLABS, LLC which is a Texas corporation)
16 headquartered in Dallas, TX and were and are regularly engaged in the business of licensing,
17 manufacturing, formulating, packaging, distributing, and/or selling, either directly or indirectly,
18 through third parties or related entities, non-prescription dietary supplements for sale to, and use by,
19 members of the general public, and as a part of their business, said Defendants, directly or indirectly
20 were and are engaged in the  manufacturing/formulating/packaging/distributing/selling of a
21 purported nutritional/dietary supplement under the proprietary, trademarked name "Jack3d" in
22 interstate commerce and in California, which Plaintiff-Decedent ingested as alleged herein.

23 4.  Jack3d contains the ingredient  1,3-dimethylamylamine (also known as, and
24 hereinafter referred to, as "DMAA"), a dangerous sympathomimetic, which can cause adverse
25 cardiovascular events such as heart attack, stroke, heart arrhythmias, heart palpitations, dizziness,
26 cardiac arrest, rhabdomyolysis, loss of consciousness and death.

27 5.  Defendants JONATHAN VINCENT DOYLE and JACOB GEISSLER, who live in
28 Denton, TX, are individuals having ownership interest in and executive positions in the USP entities.

Upon information and belief, Defendants DOYLE and GEISSLER are shareholders in each of the USP entities, are corporate officers in each of the USP entities, direct and participate in the day to day operations of the USP entities, were responsible for the acts of the USP entities and for all intents and purposes own, operate and act through the USP entities. (USPLABS, LLC, JONATHAN VINCENT DOYLE (an individual), JACOB GEISSLER (an individual), USPLABS JACK3D, LLC, and USPLABS HOLDING, LLC, are hereinafter collectively referred to as "USP" or "USP DEFENDANTS".)

6. Furthermore, USP DEFENDANTS were at all times alleged herein under the control of their founders and dominant principals, Defendants JONATHAN VINCENT DOYLE and JACOB GEISSLER. The Corporate filing for USPLabs, LLC with the Texas Secretary of State states "The limited liability company is to be managed by managers, the names and addresses of the governing persons are set forth below" wherein GEISSLER and GOYLE are named.

7. At all times herein alleged, each of the acts of the employees, including but not limited to Defendants DOYLE and GEISSLER, were on behalf of, for the benefit of, at the direction of, and at the behest of USP DEFENDANTS and were ratified by said USP DEFENDANTS. Further, each of the acts of the employees, including but not limited to Defendants DOYLE and GEISSLER were done pursuant to and in accordance with corporate policy.

8. USP DEFENDANTS, and each of them, are engaged in a single enterprise of developing, marketing, and distributing dietary supplements. There exists, and at all times herein alleged, there existed, a unity of interest in ownership between and among USP DEFENDANTS such that any individuality and separateness between and among USP DEFENDANTS has ceased and the individual USP DEFENDANTS are the alter-egos of and agents of each other and exerted control over each other. Adherence to the fiction of the separate existence of the USP DEFENDANTS as entities distinct from each other will permit an abuse of the corporate privilege and would sanction fraud and promote injustice. The alter ego entities were formed for the purpose of selling untested and dangerous dietary supplements, including Jack3d, which carried a high risk of causing serious personal injuries, without being responsible to the injured customers.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

9. Additionally the corporate fiction of USP DEFENDANTS, and each of them, were a sham to perpetrate a fraud as herein alleged and to shield GEISSLER, DOYLE and the responsible USP entities from liability for breach of their legal and equitable duties. Adherence to the fiction of the separate existence of the USP DEFENDANTS would promote injustice and result in inequity to Plaintiffs.

10. At all relevant times, the USP DEFENDANTS were each engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities Jack3d and/or the Defendants are otherwise responsible as corporate successors for the liabilities of the entities that designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled and/or sold Jack3d.

11. Upon information and belief, at all relevant times, the USP DEFENDANTS were present and doing business in the State of California.

12. At all relevant times, the USP DEFENDANTS transacted, solicited, and conducted business whether through retail stores or through internet merchants in the State of California and derived substantial revenue from such business.

13. At all relevant times, the USP DEFENDANTS expected or should have expected that their acts would have consequences within the United States of America and within the State of California.

## II. Ingredient Manufacturers

14. Defendant NATURAL ALTERNATIVES INTERNATIONAL, INC. (hereinafter "NAI"), is a California corporation headquartered in San Marcos, CA and was and is regularly engaged in the business of contract manufacturing of ingredients and/or mixtures, both trademarked and not, used in non-prescription nutritional/dietary supplements for sale to, and use by, members of the general public, and as a part of their business, said Defendant, directly or indirectly was and is engaged in the manufacturing/formulating/packaging/distributing/selling of an ingredient trademarked under the name CarnoSyn for the USP DEFENDANTS for use in Jack3d in interstate commerce and in California, which Plaintiff-Decedent ingested as alleged herein.

15. NAI manufactured the CarnoSyn contained in the actual Jack3d purchased and ingested by Plaintiff-Decedent as alleged herein. CarnoSyn contains beta-alanine, which Defendant advertises/ encourages users to increase the length, workload and intensity of workouts. As a result, persons using products containing CarnoSyn, such as the Jack3d used by Plaintiff-Decedent, and engaging in more intense workouts are subject to heightened effects and exacerbation of the sympathomimetic and adverse effects of DMAA. NAI additionally marketed CarnoSyn to USP knowing the ingredient would be used in a product containing sympathomimetics, which when used in conjunction with CarnoSyn during intense workouts would subject consumers to an increased risk from cardiovascular stress. Moreover, CarnoSyn, as a trademarked ingredient may include as yet undetermined chemicals in addition to beta-alanine contributing to the toxicity of Jack3d. As alleged herein, as a result of exposure to CarnoSyn and DMAA contained in the Jack3d ingested by Plaintiff-Decedent, Plaintiffs suffered injuries as alleged herein.

**III.    Retailers**

16. Defendant GNC CORPORATION ("GNC") is a Delaware corporation with its principal place of business located in Pittsburgh, Pennsylvania. Defendant GNC conducted regular and sustained business in the State of California and throughout the nation, including the sale of Jack3d by its retail outlets, affiliates and franchisees. Defendant GNC was regularly engaged in the business of packaging, distributing, and/or selling, either directly or indirectly, through third parties or related entities, non-prescription nutritional/dietary supplements for sale to, and use by, members of the general public, and as a part of their business said Defendant sold the Jack3d purchased by, ingested by and causing harm to Plaintiff-Decedent as alleged herein.

17. At all times herein alleged, each of the acts of the employees of GNC were on behalf of, for the benefit of, at the direction of, and at the behest of GNC and were ratified by GNC. Further, each of the acts of the GNC employees were done pursuant to and in accordance with corporate policy.

18. The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 500, inclusive, are unknown to Plaintiffs who are therefore ignorant of the true names and sues said Defendants by such fictitious names. Plaintiffs believe and allege that

each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

19. At all times hereinafter alleged, "DEFENDANTS" include all herein named Defendants as well as Defendants DOES 1 through 500, inclusive.

20. At all times herein alleged, each of the DEFENDANTS was the agent, servant, partner, aider and abettor, co-conspirator and joint venturer of each of the remaining DEFENDANTS herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other DEFENDANTS, knowing that their conduct constituted a breach of duty owed to Plaintiffs.

## PLAINTIFF-DECEDENT

21. At all relevant times, Plaintiffs LEANNE SPARLING and MICHAEL J SPARLING were residents of the State of California.

22. Plaintiffs LEANNE SPARLING and MICHAEL J SPARLING are the parents of, and sole successors in interest to the Plaintiff-Decedent MICHAEL L SPARLING.

23. Plaintiff-Decedent MICHAEL L SPARLING was a domicile of California since although at the time of his injury he was temporarily residing in the State of Texas, he intended to return to California. He had no intent to remain in Texas indefinitely. He was there temporarily. He was registered to vote in California, paid taxes in California, his family was located in California, and he was only physically present in Texas for a little over one month as opposed to California where he resided his entire life.

24. In or about late April until his death on June 1, 2011, Plaintiff-Decedent ingested Jack3d purchased from a GNC store in Sacramento, California and at Fort Bliss, El Paso, Texas.

25. At no time did Plaintiff-Decedent take more than the recommended dosing regimen contained in Jack3d.

26. On the morning of June 1, 2011, the Plaintiff-Decedent MICHAEL L SPARLING took the recommended dosage of Jack3d, which he purchased from a GNC on the Fort Bliss base.

Shortly thereafter he engaged in physical training with his unit during which he collapsed, requiring immediate medical attention.

27.     On June 1, 2011, after taking the recommended dosing of and as a result of Jack3d manufactured by USP and NAI and sold by GNC, Plaintiff-Decedent suffered cardiac arrest, hyperthermia, rhabdomyolysis, disseminated intravascular coagulation, death and related injuries.

## FACTUAL BACKGROUND

### The JACK3D

28.     Jack3d is a trademarked product sold by USP. Jack3d contains the following ingredients as depicted in its label:

 

29.     One of the ingredients of Jack3d is DMAA. DMAA is a dangerous sympathomimetic. Jack3d additionally contains caffeine, thereby increasing the sympathomimetic qualities and dangers of DMAA.

30.     Jack3d additionally contains CarnoSyn a propriety beta-alanine product made by NAI, which is also dangerous.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

31. Additionally, Jack3d does not work.

32. Jack3d is sold through retailers such as GNC in California and across the country.

*DMAA, a Dangerous Chemical Shunned by the Pharmaceutical Industry, Reemerges in Dietary Supplements*

33. DMAA is an active ingredient contained in Jack3d manufactured, marketed, distributed, and sold by DEFENDANTS.

34. DMAA, also known as methylhexanamine (MHA), is an aliphatic amine compound that has properties mimicking those of the endogenous neurotransmitters of the sympathetic nervous system. As such, it belongs to a group of compounds known as "sympathomimetics." Members of this class include ephedrine and the amphetamines.

35. While sympathomimetics are used by physicians to increase blood pressure and to constrict blood vessels, they are also widely abused because of their perceived ability to enhance athletic performance and in some cases induce euphoria.

36. Sympathomimetic compounds were originally developed in the 19th century as drugs for the treatment of cold symptoms. Compounds capable of constricting blood vessels were actively sought. First cocaine, then epinephrine, and in 1925 ephedrine, were used for this purpose. However, the adverse effects, inability to provide long term relief and addictiveness eventually resulted in the search for a similarly structured chemicals Through trial and error, it was eventually determined that slight modification of the ephedrine molecule would result in molecules having equivalent vasoconstrictor properties to ephedrine. These modifications eventually led to the development of DMAA, originally named Fouramine.

37. In 1943, DMAA was introduced as a nasal decongestant by Eli Lilly under the trade name of Forthane. For unexplained reasons Lilly voluntarily withdrew Forthane from the market in 1983. No other prescription or over-the-counter drugs or dietary supplements used DMAA from 1983 until approximately 2005. In 2005, Patrick Arnold, a chemist convicted for his role in the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

BALCO baseball steroid scandal, reintroduced MHA/DMAA as an over-the-counter dietary supplement with amphetamine-like qualities. It was marketed as an alternative to ephedrine. The use of DMAA in dietary supplements spread and eventually found its way into Jack3d.

38. Animal testing in a variety of models demonstrated that DMAA was a potent pressor drug causing increases in blood pressure that is comparable to ephedrine. The structure of and mechanism by which DMAA increases blood pressure is thus similar to ephedrine. Dietary supplements containing ephedra, the natural form of ephedrine, were ordered off the market by the FDA in 2004, because the blood pressure and heart rate effects were associated with a number of serious adverse events to users including heart attack, stroke and death.

*Defendants' Jack3d Claims*

39. DEFENDANTS conveyed their deceptive claims about the Jack3d through a variety of media, including television, newspapers, magazines, direct mail, the Internet, point of sale displays, and on the Jack3d labels and packaging. In addition, retailers, including Defendant GNC, promoted, marketed and sold Jack3d in stores, on its websites and through other mediums of advertising.

40. In their advertisements and on their website, USP represented that Jack3d is:

- "Voted # 1 Pre-Workout"

- "Backed by 2 Peer-Reviewed Published Clinical University Research Studies"

- "Jack3d is now backed by multiple University studies, **including double-blind, placebo-controlled research.**"

- "Jack3d – **proven in the real world & in the lab** . . ."

These representations were false, misleading and deceptive.

41. USP further represented on its website that

- "The hemodynamic response to acute ingestion was assessed as well. OxyElite Pro (another DMAA-containing product made by USP) did not result in a statistically significant change in heart rate or diastolic pressure, but did cause a statistically significant change in systolic blood pressure from baseline. This increase was mild and transient, and was similar to the changes reported in the scientific literature for subjects ingesting an amount of caffeine equivalent to 2-3 cups of coffee."

- "Jack3d, which contains DMAA, was well tolerated and no serious adverse events were noted."

- "At the beginning and end of the study, blood pressure, heart rate and various indicators of renal and liver function were assessed. The study found that there were no statistically significant changes from baseline to the end of the study. No serious adverse events were noted."

- "NEWLY RELEASED, GROUNDBREAKING RESEARCH STUDIES SHOW USPLABS' DMAA SUPPLEMENTS ARE SAFE AND EFFECTIVE."

USP's representations were false, misleading and deceptive.

42.    USP also advertises on fitness blogs and websites such as bodybuilding.com making similar representations. In fact, Defendant GEISSLER even writes letters on such sites claiming Jack3d:

-    will make "everyone <u>dominate the weights and have crazy, lasting energy along with sick, muscle-engorging pumps</u>,"

-    contains a "synergistic combination (which) is KEY,"

-    is not like other products, which are "a bunch of ingredients thrown together haphazardly," and

-    uses "only the highest quality ingredients."

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

However, these like the other misrepresentations with respect to the safety, efficacy, and purity of Jack3d, are false, misleading and deceptive.

43. USP has also issued press releases, which promote the purported safety and efficacy of Jack3d. For example, on February 24, 2012, just weeks after the Defense Department pulled Jack3d from military store shelves, USPLabs issued a press release entitled "USPLabs Jack3d Peer-Review Clinical Safety Study Published." In its press release, USPLabs stated:

> USPlabs Jack3d™ and OxyElite Pro® are among the most studied finished dietary supplements ever sold. This most recent study is the 7th peer-reviewed, published clinical trial supporting the safe use of DMAA when used as directed, in addition to an industry estimated over one billion servings consumed by satisfied customers. More specifically, Jack3d™ & OxyElite Pro® have 5 clinical trials that show they are safe when used as directed.

44. USP made similar statements about the purported safety and efficacy of the Jack3d in another press release, dated March 7, 2012, entitled "USPlabs Shares Results of Seven Peer-Reviewed DMAA Safety Studies as Part of Scientific Review on Jack3d™ . . . ."

45. USP owns and operates another website, www.dmaaresearch.com, where it makes similar statements about the purported research supporting the safety and efficacy of DMAA. For example, on its dmaaresearch.com website USP lists "[a]ll current available clinical data on DMAA," which are also purportedly "conducted by independent experts and published in respected journals." As discussed herein, the "seven" studies cited by USP and discussed on its websites, are not conducted by independent experts, are not published in legitimate journals, and furthermore, demonstrate that Defendants' claims about the safety and efficacy of Jack3d are unsubstantiated, false and deceptive.

46. USP's websites, including www.USPLabsDirect.com and www.DMAAResearch.com are available to the general public and USP's advertisements in other media promote these websites.

47. GNC further enabled USP to make representations concerning the quality of the Jack3d. The retailers that sold the Jack3d adopted, and are responsible for, the representations USP

made on packaging regarding the safety and efficacy of the Jack3d, when they decided to place such Jack3d on their store shelves, on military bases and on retail websites, and thereafter advertised and sold such Jack3d to Plaintiff-Decedent. Further, GNC advertised and included a prominent link on its own website to USP's Jack3d websites.

48.     GNC further reinforces these claims of safety and efficacy. For example, it states that Jack3d is "University Studied." The representation that Jack3d is "universally studied" implies that the studies universally demonstrate safety, when instead they demonstrated blood pressure and heart rate findings which do not demonstrate safety.

49.     Despite the overwhelming evidence that Jack3d is neither safe nor effective, GNC continued to make public statements to the contrary, assuring consumers that DMAA is safe. For example, in response to the FDA's 2012 warning letter GNC stated: "We are completely opposed to this unilateral, factually and legally unfounded action by the FDA and we believe the large consumer base that has safely used products containing DMAA in millions of doses will also oppose it." GNC further stated that "DMAA is perfectly safe when taken as directed."

50.     In February 2012, under pressure from the Department of Defense after the death of two soldiers from Jack3d, including Plaintiff-Decedent, GNC agreed to pull its DMAA-containing products, including Jack3d, from its stores on military bases. Nevertheless, GNC continues to market and sell Jack3d to consumers in its other retail stores and through its online website.

51.     NAI advertises of its beta-alanine ingredient, under the trademarked name CarnoSyn, that:

> In nearly every athletic endeavor, from bodybuilding and cycling to running and swimming, numerous clinical studies have proven Beta-Alanine is effective in boosting muscle carnosine, buffering lactic acid, increasing strength and endurance and speeding recovery.

52.     Dr. John Wise, who is affiliated with the NAI laboratory, in web videos supports the efficacy of CarnoSyn and beta-alanine by claiming that "virtually any athlete is going to be benefitted by supplementing with beta-alanine."

53.     Without requisite proof, DEFENDANTS also claim that Jack3d is safe, effective, and proven by research. For the types of marketing claims at issue, the Federal Trade Commission rules, mirroring common law duties of fair representation, require that DEFENDANTS actually have the level of proof claimed, here clinical proof, at the time the claims are made. However, DEFENDANTS did not, and have never possessed the requisite proof.

54.     The health problems associated with Jack3d manifest themselves when consumers, including Plaintiff-Decedent as alleged herein, use the product at recommended dosage levels. In fact, in a warning letter sent to USP, FDA expressed its opinion that Jack3d is adulterated under §402(f)(1)(A) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §342, in that Jack3d presents a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling:

> . . . Oxy Elite Pro and Jack3d are adulterated under 21 U.S.C. 342(f)(1)(B) and 350b(a) because they contain a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury. Introduction of such products into interstate commerce is prohibited under 21 U.S.C. 331(a) and (v). To the best of FDA's knowledge, there is no history of use or other evidence of safety establishing that dimethylamylamine will reasonably be expected to be safe as a dietary ingredient. In fact, dimethylamylamine narrows the blood vessels and arteries, which increases cardiovascular resistance and frequently leads to elevated blood pressure. This rise in blood pressure may increase the work of the heart such that it could precipitate a cardiovascular event, which could range from shortness of breath to tightening of the chest and/or a possible myocardial infarction (heart attack).

55.     Notwithstanding significant and mounting evidence that Jack3d is falsely labeled, ineffective, and poses significant health risks, DEFENDANTS did not recall Jack3d, which remains on the market. Despite the evidence of significant health risks, DEFENDANTS continued to make

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

material misrepresentations and omissions on Jack3d packaging and labeling. Moreover, as stated herein, DEFENDANTS continue to downplay the true health risks involved with consuming Jack3d.

56. Remarkably, USP has even filed suit in the Northern District of Texas (Case 3:12-cv-01605-O) against an individual and entity for allegedly false and disparaging statements about Jack3d. The statements included well-known, incontrovertible facts about Jack3d (which contains DMAA) such as that it is an "amphetamine-like compound," and that it "speeds up your heart rate." USP continues to not only make misrepresentations to the public about the nature of DMAA and Jack3d as alleged above, it so vehemently denies their sympathomimetic qualities that it is suing individuals for defamation. Making such action even more reprehensible is that USP's own funded studies concede DMAA is a "simple aliphatic amine with sympathomimetic properties" (Whitehead, PN, Schilling, BK, Farney, TM, Bloomer, RJ. Impact of a dietary supplement containing 1,3-dimethylamulamine on blood pressure and bloodborne markers of health: a 10-week intervention study. *Nutrition and Metabolic Insights* 2012:5 33-39.) as does the FDA warning letter sent to USP. This lawsuit was brought in an attempt to intimidate and stifle the dissemination of essential safety information about Jack3d.

*Studies Promoted by USP Demonstrate Lack of Safety or Efficacy for Jack3d*

I.    Claims Regarding Safety

57. Defendants also claim that the safety and efficacy of Jack3d has been shown in clinical studies. For example, at its usplabsdirect.com and dmaaresearch.com websites, USP lists seven studies involving DMAA and states: "NEWLY RELEASED, GROUNDBREAKING RESEARCH STUDIES SHOW USPLABS' DMAA SUPPLEMENTS ARE SAFE AND EFFECTIVE". However, none of these studies constitutes reliable scientific or clinical proof.

58. Despite claims made by USP in its marketing and advertising, as detailed above, Jack3d is not scientifically tested or proven to provide, and does not provide the advertised health benefits of "increase[d] . . . fat breakdown and energy expenditure," "reduced fat mass," "weight loss" and other similar benefits. Accordingly, USP's marketing claims that Jack3d is proven,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

including because it is "UNIVERSITY STUDIED," "Scientifically Reviewed," and "PHARMACIST FORMULATED" are false, misleading, and likely to deceive the ordinary consumer.

59. Properly-conducted human studies do not demonstrate the safety or efficacy of the Jack3d or DMAA. In fact, human data regarding the safety or efficacy of DMAA are few and are the majority are funded by the USP Defendants.

60. Even Defendants' own purported clinical proof demonstrates the falsity of its claims. On its websites, usplabsdirect.com (which is referred to on the Jack3d's labeling) and dmaaresearch.com, USP lists "seven" studies on DMAA containing products. USP characterizes one study that had male and female cohorts as two studies in order to state "seven" DMAA studies substantiate its claims. USP admits its involvement and funding of five of the seven studies. Furthermore, none of these studies provide substantiation for the marketing claims

    a. McCarthy, Farney et al. 2012: Twelve subjects ingested OxyELITE Pro or a placebo over two days. USPLabs provided funding for the study, which analyzed subjects' blood markers and metabolic rates. The authors acknowledged that "little objective scientific evidence is available" on DMAA, and that "some subjects reported feeling 'jittery', 'on-edge', 'sweaty', and 'shaky', sometimes involving cold sweats, a racing heart beat, and poor sleep quality on the night of treatment." According to the authors, and with respect to DMAA, "no published reports are available pertaining to these [weight/fat loss] effects in human subjects." (emphasis added). The authors also noted that subjects consuming DMAA-containing OxyELITE Pro experienced increased heart rate and blood pressure. The study concluded that "well-controlled intervention trials are needed in order to determine the chronic effects of the supplement on body weight/fat loss and associated metabolic and biomechanical markers of health."

    b. McCarthy, Canale et al. 2012: Thirty-two subjects ingested OxyELITE Pro or a placebo over eight weeks. The study was funded by USPLabs. Five of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

sixteen subjects who consumed OxyELITE Pro reported jitters and sleeplessness when consuming two capsules per day. The authors observed an increase in resting heart rate for those consuming DMAA-containing OxyELITE Pro and noted that the lack of control of subjects' dietary intake was a limitation.

c.   Farney, McCarthy et al. 2012: Once per day for two weeks seven men ingested Jack3d, and six subjects ingested OxyELITE Pro. The study was funded by USPLabs. The authors noted that the lack of a placebo is a limitation of this study. Because appetite was lower on subjects consuming OxyELITE Pro, but not Jack3d, the authors observed that it was possible that ingredients other than DMAA or caffeine may be responsible for appetite suppression. According to the study, "Based on our data, which admittedly involved a very small number of subjects, it appears that such products should be avoided by individuals who are hypersensitive [] or who are pre-hypersensitive." Subjects reported sleeplessness, anxiousness, feeling of chills, tingling, sweating, and shakiness.

d.   Bloomer, Schilling et al. 2012: Twenty-five men were assigned to consume a placebo or Jack3d. The study was funded by USPLabs. Systolic blood pressure increased in those consuming Jack3d. The authors stated that "Due to the fact that our sample size is small, additional well-designed experiments of similar scope, inclusive of larger sample sizes, are needed to extend the findings presented within." The authors also noted that only "some support" for safety was provided, and that "more work is needed involving a larger intervention period and the inclusion of additional measures of health [], to more fully elucidate the safety or oral [DMAA]."

e.   Bloomer, Harvey et al. 2011: Ten men consumed five different amounts of DMAA. No placebo was used, which the authors conceded was a limitation to this study. The authors noted that no study had tested DMAA's effect on

1  heart rate and blood pressure in humans. The study found that consuming

2  DMAA with caffeine results in increased systolic blood pressure, diastolic

3  blood pressure, and rate pressure product. Dr. Bloomer disclosed his

4  conflicts of interest with USPlabs and other nutritional supplement

5  companies.

6  f.  Bloomer, McCarthy et al. 2011: Twelve subjects ingested placebo, caffeine,

7  DMAA, or DMAA plus caffeine over four days and immediately prior to

8  competing a 10k run. The authors noted that "[t]he literature pertaining to

9  the use of [DMAA] is scant." The authors concluded that DMAA increases

10  systolic blood pressure, and had no impact on the outcome of greatest interest

11  – run time.

12  61.  USP made further misrepresentations on its website that two studies conducted by Dr.

13  Richard Bloomer were conducted by an "independent scientist without the involvement of the

14  company," these studies like the other five are all from the same laboratory at the University of

15  Memphis. Dr. Bloomer was a lead researcher in each of the seven studies cited by USP. Moreover,

16  Bloomer, Harvey et al. 2011, which USP claims was conducted by an independent scientist,

17  concedes that the opposite is true by stating at the conclusion of the study "CONFLICT OF

18  INTEREST STATEMENT – Richard J. Bloomer, PhD discloses conflicts of interest with . . .

19  USPLabs." On information and belief, Dr. Bloomer has received $524,332 in funding from

20  USPLabs: $132,860 (2010-2011), $225,600 (2011-2012), $128,860 (2012-2013), and $37,012

21  (2012-2013).

22  62.  Bloomer, Harvey et al. 2011 further reported that both caffeine and DMAA increased

23  diastolic and systolic blood pressure separately (with the effect of DMAA being greater than

24  caffeine), and that when the two ingredients were combined the healthy study volunteers

25  experienced mean blood pressures of 140 mm Hg, a 20% increase consistent with hypertension

26  despite low normal pre-exposure pressures. The data from Bloomer, Harvey et al. 2011 thus

27  demonstrates that DMAA given in the proprietary formulation as compared to alone has a less

28

1 pharmacologically clean effect and results in a greater increase in rate-pressure product ("RPP," a

2 measure of myocardial work or cardiovascular risk).

3     63.   USP further mischaracterizes the sympathomimetic effects of DMAA, specifically

4 including the statistically significant increased blood pressure found by one study caused by Jack3d,

5 by comparing the risk to mild amounts of coffee, a universally regarded safe sympathomimetic when

6 used in isolation:

7         The hemodynamic response to acute ingestion was assessed as well. OxyElite Pro

8         did not result in a statistically significant change in heart rate or diastolic pressure,

9         but did cause a statistically significant change in systolic blood pressure from

10         baseline. This increase was mild and transient, and was similar to the changes

11         reported in the scientific literature for subjects ingesting an amount of caffeine

12         equivalent to 2-3 cups of coffee. (emphasis added)

13     This statement with respect to acute ingestion is misleading given the study results

14 demonstrate that "Compared to pre-ingestion and in general, both supplements resulted in an

15 increase in SBP, DBP, and RPP from 5%-15%, with a peak occurring at the 60 or 90 minute post-

16 ingestion time." The study went on to highlight the acute cardiovascular risks:

17         As expected based on the pharmacologic profiles of caffeine and of 1,3-

18         dimethylamylamine, acute intake of dietary supplements containing these agents

19         results in an increase in myocardial work. Specifically, SBP is increased significantly

20         in response to treatment, while DBP, and RPP increase to a lesser extent.

21     64.   The "seven" cited studies do not constitute substantiation for Defendants' claims

22 relating to safety and efficacy, and in fact, are proof that Jack3d is unsafe and ineffective. First,

23 there are no independent studies performed by researchers without conflicts: each of the studies

24 come from a single laboratory funded by USP, and are led by a researcher who has received over

25 $500,000 from USP. Second, the studies, which contain a total of 99 subjects, are grossly

26 underpowered (a fact repeatedly conceded in the reports themselves), restricted to a very young

27 population, and there is no attempt to characterize the pharmacokinetics or purity of the drugs.

28 Despite the lack of reliability or validity of the purportedly independent studies, the studies present a

relatively consistent picture. DMAA, particularly when combined with caffeine or other agents, causes highly significant increases in blood pressure in healthy, resting individuals within one hour of consumption in a manner consistent with its known action as a vasoconstrictor. These sorts of changes should be anticipated to cause substantial and possibly dangerous increases in blood pressure during exercise (particularly weight lifting, cycling, or other resistance exercise). Vasoconstriction during exercise would increase myocardial oxygen consumption leading to an increased risk for cardiovascular events like heart attack and stroke. In other words, the studies themselves, flawed as they are, demonstrate the dangerous and synergistic sympathomimetic effects of the DMAA formulation contained in Jack3d. In fact, Defendants do not deny the synergistic effects of DMAA and caffeine stating on their website "a common synergistic combination."

65. Thus, USP knew, or in the exercise of reasonable care ought to have known, from their own studies that DMAA, when used in isolation or in conjunction with the other ingredients contained in Jack3d including caffeine and CarnoSyn, is dangerous and could injure or kill consumers like Plaintiff-Decedent. In fact, USP knew or should have known long before its own studies that DMAA could cause cardiovascular adverse effects based on the fact DMAA is in the same class of chemicals as amphetamines.

66. In making these and similar representations in advertising and in the Jack3d product labeling, USP misled users and Plaintiff-Decedent about the risks of Jack3d. USP also failed to adequately warn users of the potential serious dangers of DMAA toxicity in susceptible users which USP knew or should have known might result from consuming Jack3d. USP widely and successfully marketed the products throughout the United States by, among other things, conducting a marketing campaign which misrepresented the testing for efficacy and potential risks of the products in order to induce widespread consumption.

67. Likewise, GNC knew or should have known that DMAA could cause cardiovascular adverse effects based on the fact DMAA is in the same class of chemicals as amphetamines.

68. GNC joined in the misrepresentations about DMAA, by asserting in its marketing of Jack3d that GNC conducts a review and has a requirement that the products it sells have labels that truthfully disclose health and safety issues and that the ingredients be safe. GNC represents that it

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  exercises the highest standard of care in the nutritional supplement industry by "demanding truth in
2  labeling, ingredient safety." Moreover, on information and belief, GNC considered, reviewed and
3  rejected the idea of selling its own propriety products containing DMAA with knowledge that
4  DMAA could injure consumers.

5        II.      Claims Regarding Efficacy and Composition

6        69.     USP similarly knew, or in the exercise of reasonable care ought to have known, that
7  Jack3d is not effective for weight loss or any other health benefits claimed by USP.

8        70.     USP additionally knew that consumers believe that natural supplements are more
9  healthful and less dangerous than synthetic, chemically produced supplements. USP represented in
10  its advertising and marketing that Jack3d is a natural dietary supplement, when in fact it knew that
11  the active ingredient DMAA, was not a natural ingredient but was a chemically compounded,
12  synthetic ingredient. In fact, in a response letter to FDA on May 15, 2012, it acknowledged DMAA
13  was synthetically created. USP further knew that DMAA is not contained in natural substances like
14  geranium oil. It made these false representations that Jack3d is a natural product to mislead and
15  falsely reassure consumers that Jack3d is a safe product.

16        71.     FDA denied that DMAA is a natural as opposed to synthetically-created compound:
17  "The agency additionally warned the companies that synthetically-produced DMAA is not a 'dietary
18  ingredient' and, therefore, is not eligible to be used as an active ingredient in a dietary supplement.
19  DSHEA defines a dietary ingredient as a vitamin, mineral, amino acid, herb or other botanical, a
20  dietary substance for use by man to supplement the diet, or a concentrate, metabolite, constituent,
21  extract, or combination of these substances."

22        72.     The purpose of these submission requirements for dietary supplements is to protect
23  consumers from exposure to new, synthetically created dietary supplements which are not
24  demonstrated to be safe and effective, the exact situation here.

25        73.     USP attempted to assuage concerns from critics, FDA and concerned consumers
26  about the safety of DMAA by suggesting DMAA comes from a naturally occurring herb and is
27  therefore safe. However, DMAA is a dangerous synthetically-created chemical known by industry
28  insiders like USP to display sympathomimetic side effects. A single Chinese study claims that

DMAA occurs naturally in geranium oil (Ping Z, Jun Q, and Qing L. A study on the chemical constituents of geranium oil. Journal of Guizhou Institute of Technology 25: 1996.) The New Zealand National Measurement Institute performed a rigorous evaluation of this claim and found it impossible to substantiate (Lisi A, Hasick N, Kazlauskas R, and Goebel C. Studies of methylhexaneamine in supplements and geranium oil. Drug Test Anal 2011.) Health Canada likewise could find no evidence that DMAA occurs in nature (Health Canada, Health Products and Food Branch. Classification of 1,3-dimethylamylamine (DMAA). http://www.scribd.com/doc/82744576/DMAA-Health-Canada-2011. Accessed March 22, 2012.)

74. Additionally, in a study published June 25, 2012 (ElSohly, MA, et al., Pelargonium oil and Methyl Hexaneamine (MHA): Analytical approaches supporting the absence of MHA in authenticated Pelargonium graveolens plant material and oil. Journal of Analytic Toxicology: published online: June 25, 2012), the authors concluded, after numerous and varied tests of geranium oils and plants, that geranium oils and plants contain no detectable levels of DMAA. This research refutes any claims that synthetic DMAA is identical to naturally derived ingredients. It is impossible for synthetic DMAA to be identical to the natural geranium plant and oil since geranium plant and oil do not contain detectable levels of DMAA.

75. Despite these facts, USPlabs has circulated a letter purporting to have proof from two laboratories claiming that DMAA can be found in geranium oil. The data are allegedly not available for review because they have been submitted for publication. USP persists in its representations that DMAA is a natural chemical to reassure consumers that the product is safe and natural, when in fact it is neither.

*Adverse Events From DMAA Pile Up and FDA Warns USP*

76. On December 6th, 2011, the US Army removed all DMAA containing compounds from its commissaries. This action followed the deaths of two soldiers believed to be due to Jack3d, including that of Plaintiff-Decedent. A case series from New Zealand reported three cases of cerebral hemorrhage in adults taking DMAA (Gee P, Tallon C, Long N, Moore G, Boet R, Jackson S. Use of Recreational Drug 1,3-Dimethylethylamine (DMAA) Associated With Cerebral Hemorrhage.) In one case, a 41 year old man developed a systolic blood pressure of 240 mm Hg

thirty minutes after taking a DMAA supplement and bled into his brain. Another published report attributes stress-induced cardiomyopathy to use of DMAA (Salinger L, Daniels B, Sangalli B, Bayer M. Recreational use of bodybuilding supplement resulting in severe cardiotoxicity. Clin Toxicol. 2011;49(6):573-574.) Pieter Cohen, a Harvard internist, has recently drawn attention to DMAA in a letter to the Archives of Internal Medicine (Cohen PA. DMAA as a Dietary Supplement Ingredient. Arch Intern Med. 2012 May 7 [Epub ahead of print].)

77. In a letter addressed to USPLabs from FDA dated April 27, 2012, the Agency warned that it had received 42 adverse event reports on products containing DMAA, including cardiac disorders, nervous system disorders, and death. Many of those adverse event reports were specifically for Jack3d and stretch back to early 2010, if not earlier.

78. Daniel Fabricant, director of FDA's Dietary Supplement Program (DSP) stated "Before marketing products containing DMAA, manufacturers and distributors have a responsibility under the law to provide evidence of the safety of their products. They haven't done that and that makes the products adulterated." FDA challenged manufacturers to demonstrate that DMAA was in use as a dietary supplement prior to 1994.

79. USP attempted to deflect attention away from safety concerns and to misrepresent the actual risks of DMAA by stating numerous times on its website that "no serious adverse events were noted in the study." USP neglected to inform consumers and the public, including Plaintiff-Decedent herein who relied on USP's representations and misleading comments, that in fact FDA had received dozens of serious adverse events from people taking DMAA, including death.

**COUNT I**

**NEGLIGENCE**

**(Against All Defendants)**

80. Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

81.     At all times herein mentioned, DEFENDANTS, and each of them, had a duty to exercise reasonable care in the research, development, testing for safety, formulation, manufacture, hiring of and use of qualified scientific or medical personnel, labeling, packaging, promotion, advertising, marketing, distribution, sale, and otherwise releasing into the stream of commerce Jack3d.

82.     DEFENDANTS, and each of them, breached their duty of reasonable care to Plaintiffs in that they negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled and/or sold Jack3d. Specifically, DEFENDANTS failed to exercise reasonable care in ways which included, but were not limited to, one or more of the following particulars:

    a.     In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff-Decedent herein, of the dangerous and defective characteristics of Jack3d;

    b.     In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff-Decedent herein, of the propensity of Jack3d to cause side effects, serious injury and death;

    c.     In their failure to adequately represent the result of clinical trials before marketing Jack3d;

    d.     In representing that Jack3d was safe and effective for its intended use when, in fact, the product was unsafe for its intended use;

    e.     In failing to perform appropriate, reliable and valid pre-market testing of Jack3d;

    f.     In failing to perform appropriate post-market testing of Jack3d;

    g.     in failing to disclose to consumers and Plaintiff-Decedent adverse events received from FDA by users of DMAA; and

    h.     In failing to perform appropriate post-market surveillance of Jack3d.

83.     DEFENDANTS, and each of them, knew or should have known that consumers, such as Plaintiffs herein, would foreseeably suffer injury as a result of the DEFENDANTS' failure to exercise reasonable and ordinary care.

84. As a direct and proximate result of DEFENDANTS' carelessness and negligence, and of the unreasonably dangerous and defective characteristics of Jack3d, Plaintiffs suffered severe and permanent injuries. Plaintiff-Decedent endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiff-Decedent incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiff-Decedent suffered severe pecuniary loss. Plaintiffs also suffered unique injuries as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

**COUNT II**

**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**

**(Against All DEFENDANTS)**

85. Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

86. At all times material to this action, the DEFENDANTS, and each of them, were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities the dietary supplement Jack3d, which is defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiff-Decedent.

87. At all times material to this action, Jack3d was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by the respective DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

   a. When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including Plaintiff-Decedent, to risks which exceeded the benefits of the drug;

b.      The drug did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended or reasonably foreseeable way;

b.      The drug was insufficiently tested;

c.      The drug caused harmful side effects that outweighed any potential utility;

d.      The drug was more dangerous than other dietary supplements on the market; and

e.      The drug was not accompanied by adequate labeling or instructions for use to fully apprise the public and consumers, including Plaintiff-Decedent, of the potential risks and serious side effects associated with its use.

88.      In light of the potential and actual risk of harm associated with the drug's use, a reasonable person who had actual knowledge of this potential risk of harm would have concluded Jack3d should not have been marketed in that condition.

89.      There existed safer alternative designs, but DEFENDANTS, and each of them, chose to market a more dangerous design.

90.      At all times relevant herein, DEFENDANTS, and each of them knew that Jack3d would be purchased by members of the general public and would be used by such purchasers without a prescription and without any inspections for defects, and would rely upon the representations made by each of the DEFENDANTS on the product label and in other promotional and sales materials.

91.      At all times material to this action, Jack3d was expected to reach, and did reach, consumers in the State of California and throughout the United States, including Plaintiff-Decedent, without substantial change in the condition in which it was sold.

92.      DEFENDANTS, and each of them, knew or should have known of the defective nature of Jack3d but continued to research, develop, design, test, manufacture, package, formulate, inspect, label, distribute, market, promote, sell and otherwise release these products into the stream of commerce so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their products, including serious cardiovascular disorders, stroke, heart attack, dizziness, loss of consciousness, death, and other health problems.

93.     At all times, Plaintiff-Decedent used Jack3d for its intended or reasonably foreseeable purpose.

94.     As a direct and proximate result of the defective and unreasonably dangerous condition of Jack3d and of its failure to perform safely, Plaintiffs suffered injuries as set forth above.

# COUNT III

# STRICT PRODUCTS LIABILITY – FAILURE TO WARN

## (Against All DEFENDANTS)

95.     Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

96.     At all times material to this action, the DEFENDANTS were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities the dietary supplement Jack3d, which is defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiff-Decedent.

97.     At all times material to this action, Jack3d was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by the respective DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

a.      it contained warnings insufficient to alert consumers, including Plaintiff-Decedent herein, of the dangerous risks and reactions associated with Jack3d, and the comparative severity, duration and the extent of the risks and reactions;

b.      it contained warnings insufficient to alert consumers, including Plaintiff-Decedent herein, of the propensity to cause a substantial increased risk of serious bodily harm;

c.      it contained warnings insufficient to alert consumers, including Plaintiff-Decedent herein, of the dangerous drug-drug interactions and food-drug interactions; and

d.      The warnings that were given by the DEFENDANTS were not accurate, clear, and/or were ambiguous.

1    98.    Plaintiff-Decedent could not have discovered any defect in Jack3d through the

2    exercise of reasonable care.

3    99.    The DEFENDANTS, as manufacturers, sellers and/or distributors of Jack3d, are held

4    to the level of knowledge of an expert in the field.

5    100.    Plaintiff-Decedent reasonably relied on the skill, superior knowledge, and judgment

6    of the DEFENDANTS.

7    101.    The DEFENDANTS had a continuing duty to warn the Plaintiff-Decedent of the

8    dangers associated with the use of Jack3d.

9    102.    Plaintiff-Decedent consumed and used Jack3d for its intended purpose as a dietary

10    workout supplement.

11    103.    Had Plaintiff-Decedent received adequate warnings regarding the risks of Jack3d,

12    Plaintiff-Decedent would not have used it.

13    104.    As a direct and proximate result of the defective and inappropriate warnings and the

14    unreasonably dangerous and defective characteristics of Jack3d, Plaintiffs suffered injuries as set

15    forth above.

16                                 **COUNT IV**

17                        **BREACH OF EXPRESS WARRANTY**

18                   **(Against USP DEFENDANTS and DOES 1-500)**

19    105.    Plaintiffs incorporate by reference each and every prior paragraph of this Complaint

20    as though set forth in full in this cause of action.

21    106.    At all times, USP expressly warranted that Jack3d was safe, effective and fit for use

22    by consumers and users, including Plaintiff-Decedent, for its intended use, that it was of

23    merchantable quality, that it did not produce dangerous side effects, that it was made from natural

24    ingredients (i.e. geranium), and that it was adequately tested and fit for its intended purpose.

25    Specifically, in reference to research funded by USP, USP represented on its website and through its

26    advertising that:

27    a.    "The hemodynamic response to acute ingestion was assessed as well. OxyElite Pro did

28

not result in a statistically significant change in heart rate or diastolic pressure, but did cause a statistically significant change in systolic blood pressure from baseline. This increase was mild and transient, and was similar to the changes reported in the scientific literature for subjects ingesting an amount of caffeine equivalent to 2-3 cups of coffee."

b.   "Jack3d, which contains DMAA, was well tolerated and no serious adverse events were noted."

c.   "At the beginning and end of the study, blood pressure, heart rate and various indicators of renal and liver function were assessed. The study found that there were no statistically significant changes from baseline to the end of the study. No serious adverse events were noted."

d.   "NEWLY RELEASED, GROUNDBREAKING RESEARCH STUDIES SHOW USPLABS' DMAA SUPPLEMENTS ARE SAFE AND EFFECTIVE."

107.    At the time of making these and other warranties with respect to the safety, efficacy, testing and characteristics of Jack3d, USP knew or should have known that despite the above and other warranties alleged herein:

a.   In fact, the studies cited found statistically increased blood pressure, myocardial work and RPP;

b.   That participants in the studies did experience adverse cardiovascular effects from use of products even if not serious;

c.   USP's studies, given their underpowered size, did not and could not prove that Jack3d does not result in serious adverse events;

d.   USP's claims of safety and efficacy were not supported by researchers at the University of Memphis even though said researchers were financially interested and biased researchers;

e.   Jack3d contained DMAA, which was synthetically derived, and not natural;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

f. that geranium plants and oil do not contain detectable amounts of DMAA and therefore synthetic DMAA cannot be equivalent to geranium; and that

g. Since USP knew FDA had received 42 serious adverse events from DMAA products, Jack3d containing DMAA was unsafe.

108. At the time of making these warranties and other similar warranties, USP knew or should have known that, in fact, even apart from the result of USP funded studies the representations and warranties were false, misleading, and untrue in that Jack3d was not safe, effective and fit for use by consumers and users, including Plaintiff-Decedent, for its intended use, that it was not of merchantable quality, that it did produce dangerous side effects, and that it was not adequately tested or fit for its intended purpose.

109. Plaintiff-Decedent reasonably relied upon the skill and judgment of USP, and upon said express warranties in using Jack3d. As a result, Plaintiff-Decedent used Jack3d for its intended purpose.

110. USP breached said express warranties, in that, Jack3d was not safe, effective and fit for its intended purpose, were not of merchantable quality, and, in fact, caused serious and potentially lethal side effects to consumers when taken in its recommended dose.

111. Due to USP's wrongful conduct as alleged herein, Plaintiff-Decedent could not have known about the nature of the risks and side effects associated with Jack3d until after he used it.

112. As a direct and proximate result of the USP's breach of express warranties and the unreasonably dangerous and defective characteristics of Jack3d, Plaintiffs suffered injuries as set forth above.

### COUNT V

### BREACH OF EXPRESS WARRANTY

### (Against NAI and DOES 1-500)

113. Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

---

114.  At all times, NAI expressly warranted that CarnoSyn was safe, effective and fit for use by consumers and users, including Plaintiff-Decedent, for its intended use, that it was of merchantable quality, that it did not produce dangerous side effects, and that it was adequately tested and fit for its intended purpose. Specifically, NAI represented on its website and through its advertising that:

    a.  In nearly every athletic endeavor, from bodybuilding and cycling to running and swimming, numerous clinical studies have proven Beta-Alanine is effective in boosting muscle carnosine, buffering lactic acid, increasing strength and endurance and speeding recovery; and

    b.  virtually any athlete is going to be benefitted by supplementing with beta-alanine.

115.  At the time of making these warranties, NAI knew or should have known that the representations and warranties were false, misleading, and untrue in that despite the warranties, CarnoSyn and beta-alanine are not safe and not effective.

116.  Plaintiff-Decedent reasonably relied upon the skill and judgment of NAI, and upon said express warranties in purchasing Jack3d containing CarnoSyn/beta-alanine.

117.  Plaintiff-Decedent used Jack3d and CarnoSyn for their intended purpose.

118.  NAI breached said express warranties, in that, CarnoSyn/beta-alanine was not safe, effective and fit for its intended purpose, was not of merchantable quality, and, in fact, caused serious and potentially lethal side effects to consumers when taken in its recommended dose.

119.  Due to NAI's wrongful conduct as alleged herein, Plaintiff-Decedent could not have known about the nature of the risks and side effects associated with CarnoSyn/beta-alanine until after he used it.

120.  As a direct and proximate result of the NAI's breach of express warranties and the unreasonably dangerous and defective characteristics of Jack3d, Plaintiffs suffered injuries as set forth above.

# COUNT VI

## BREACH OF IMPLIED WARRANTY

### (Against All DEFENDANTS)

121. Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

122. At all times, DEFENDANTS impliedly warranted that Jack3d was safe, effective and fit for use by consumers and users, including Plaintiff-Decedent, for its intended use, that it was of merchantable quality, that it did not produce dangerous side effects, and that it was adequately tested and fit for its intended purpose.

123. At the time of making these warranties, DEFENDANTS knew or should have known that, in fact, the representations and warranties were false, misleading, and untrue in that Jack3d was not safe, effective and fit for use by consumers and users, including Plaintiff-Decedent, for its intended use, that it was not of merchantable quality, that it did produce dangerous side effects, and that it was not adequately tested or fit for its intended purpose.

124. Members of the public, including Plaintiff-Decedent, reasonably relied upon the skill and judgment of DEFENDANTS and upon said implied warranties in using Jack3d. As a result, Plaintiff-Decedent used Jack3d for its intended purpose.

125. DEFENDANTS breached said implied warranties, in that, Jack3d was not safe, effective and fit for its intended purpose, was not of merchantable quality, and, in fact, caused serious and potentially lethal side effects to consumers when taken in its recommended dose.

126. Due to DEFENDANTS's wrongful conduct as alleged herein, Plaintiff-Decedent could not have known about the nature of the risks and side effects associated with Jack3d until after he used it.

127. As a direct and proximate result of the DEFENDANTS' breach of implied warranties and the unreasonably dangerous and defective characteristics of Jack3d, Plaintiffs suffered injuries as set forth above.

# COUNT VII

## UNLAWFUL BUSINESS ACTS AND PRACTICES IN VIOLATION OF
## CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200 ET SEQ.
### (Against USP DEFENDANTS and DOES 1-500)

128.    Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

129.    California Business and Professions Code §17200 prohibits any "unfair, deceptive, untrue or misleading advertising." For the reasons discussed above, USP has engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business and Professions Code §17200, specifically including but not limited to mischaracterizing research conducted on DMAA and USP products and promoting Jack3d as safe and effective, when in fact Jack3d is neither safe nor effective.

130.    California Business and Professions Code §17200 also prohibits any "unlawful . business act or practice." USP has violated §17200's prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating California Civil Code §§1572, 1573, 1709, 1710, 1770, California Business and Professions Code §17200 et seq., California Health and Safety Code §§110660, 110760, 110765, the DSHEA (Pub. L. No. 103-417, 108 Stat. 4325 (1994)), 21 U.S.C. §343, 21 U.S.C. §379aa-1, 15 U.S.C. §45(a)(1), 49 Fed. Reg. 30999 (Aug. 2, 1984), Federal Food, Drug and Cosmetic Act §402(f)(1)(A) (21 U.S.C. §342), and the common law.

131.    Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

132.    California Business and Professions Code §17200 also prohibits any "unfair . . . business act or practice."

133.    USP's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code §17200 *et seq.* in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

134.     As stated in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth-in-advertising laws in California and other states resulting in harm to consumers. Plaintiffs assert violation of the public policy against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of California Business and Professions Code §17200 et seq.

135.     There were reasonably available alternatives to further USP's legitimate business interests, other than the conduct described herein.

136.     California Business and Professions Code §17200 also prohibits any "fraudulent business act or practice."

137.     USP's claims, nondisclosures and misleading statements, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of California Business and Professions Code §17200.

138.     USP's conduct caused and continues to cause substantial injury to Plaintiff-Decedent and other consumers. Plaintiffs have suffered injury as a result of USP's unfair conduct.

139.     USP has thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling Plaintiffs to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief.

140.     Additionally, pursuant to California Business and Professions Code §17203, Plaintiffs seek an order requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices, and requiring USP to engage in a corrective advertising campaign, including notification of Jack3d's health risks.

## COUNT VIII

### Punitive Damages Allegations

### (Against USP)

141.     Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

142.     At all times material hereto, the USP Defendants knew or should have known that the use of Jack3d could result in the development of serious harm and death, were ineffective and were

not made from natural ingredients. Additionally, USP Defendants knew or should have known that the use of Jack3d would cause certain susceptible users to suffer serious injury and death, including Plaintiff-Decedent.

143.    At all times material hereto, the USP Defendants engaged in conduct that constitutes malice, oppression or fraud, including without limitation the misrepresentations, warranties and omissions set forth above.

144.    USP Defendants attempted to misrepresent and did misrepresent facts concerning the safety, efficacy and composition of Jack3d.

145.    USP's misrepresentations included knowingly withholding material information from consumers and the public, including Plaintiff-Decedent, concerning the safety, efficacy and composition of Jack3d.

146.    USP's acts of oppression, fraud or malice were on the part of corporate officers, directors or managing agents, or were on the part of employees and were ratified or authorized by USP.

147.    USP Defendants continued to aggressively market Jack3d to consumers, including Plaintiff-Decedent, without disclosing the fact that use of Jack3d could result in the development of serious injuries, that it was ineffective and that it was not made from natural ingredients.

148.    USP knew its advertising and representations were false and misleading and omitted material information, but continued to design, develop, manufacture, market, distribute, and sell Jack3d so as to maximize sales and profits.

149.    USP Defendants intentionally concealed and/or recklessly failed to disclose to the public and Plaintiff-Decedent the potentially life threatening side effects of taking Jack3d in order to ensure continued and increased sales.

150.    USP Defendants also downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects associated with the use of Jack3d, that Jack3d was ineffective and that Jack3d was not natural, despite available information demonstrating Jack3d was unsafe, ineffective and synthetically-created.

151. USP's intentional and/or reckless failure to disclose information deprived Plaintiff-Decedent of necessary information to enable Plaintiff-Decedent to weigh the true risks of Jack3d against the benefits in making his decision to use Jack3d.

152. As a direct and proximate result of the USP's conscious and deliberate disregard for the rights and safety of consumers, Plaintiff-Decedent suffered severe injury, loss and death. Plaintiffs likewise suffered loss as alleged herein. Plaintiffs seek actual and punitive damages from USP as alleged herein.

153. The aforesaid conduct of the USP Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish USP and deter them from similar conduct in the future.

**COUNT IX**

**WRONGFUL DEATH**

**(Against All Defendants)**

154. Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

155. As a direct and proximate result of Defendants' wrongful conduct causing the death of Plaintiff-Decedent MICHAEL L SPARLING, Plaintiffs LEANNE SPARLING and MICAEL J SPARLING suffered the loss of consortium, including the loss of love, service, society, comfort, affection, moral support, companionship, and support of the Plaintiff-Decedent.

156. As a direct and proximate result of Defendants' wrongful conduct as herein alleged and of the death of Plaintiff-Decedent MICHAEL L SPARLING, Plaintiffs LEANNE SPARLING and MICAEL J SPARLING incurred the cost of burial and funeral expenses and will lose any future financial support, gifts, benefits and value from household services that Plaintiff-Decedent would have provided.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a.  As to all Counts and all DEFENDANTS, damages to the Plaintiffs in their own right and as successors in interest according to proof including as applicable:

    i.  Medical and care expenses of Plaintiff-Decedent according to proof;

    ii.  Burial and funeral expenses, according to proof;

    iii.  Loss of earnings (and/or profits) of Plaintiff-Decedent according to proof;

    iv.  Loss of future financial support, gifts, benefits and value from household services that Plaintiff-Decedent would have provided;

    v.  Other economic loss

b.  As to all Counts and all DEFENDANTS, damages to the Plaintiffs for loss of consortium, including the loss of love, service, society, comfort, and companionship of Plaintiff-Decedent by the Plaintiffs according to proof;

c.  As to all Counts and all DEFENDANTS, Awarding pre-judgment and post-judgment interest to the Plaintiff-Decedent according to proof;

d.  As to all Counts and all DEFENDANTS, Awarding reasonable costs to the Plaintiffs as provided by law;

e.  As to Count VII and USP, Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

f.  As to Count VII and USP, Ordering Defendants to engage in a corrective advertising campaign;

g.  As to Counts V and VII and USP, Awarding Plaintiffs punitive and treble damages; and

h.  As to all Counts and all DEFENDANTS, Granting all such other relief as the Court deems necessary, just and proper.

///
///
///

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Date: _2/13/2013_

ANDREWS THORNTON

Attorneys for Plaintiff

# SUMMONS
## (CITACION JUDICIAL)

COPY

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:** Additional Parties Attachment
*(AVISO AL DEMANDADO):* form is attached.

FEB 13 '13 am 10 11

**YOU ARE BEING SUED BY PLAINTIFF:** LEANNE SPARLING and
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* MICHAEL J SPARLING,
on behalf of and as representatives for MICHAEL L
SPARLING, deceased

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información n continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* | **CASE NUMBER:** *(Número del Caso):* 37-2013-00034663-CU-PL-CTL |

Superior Court of California, County of San Diego
330 West Broadway
San Diego CA 92101
Hall of Justice Courthouse

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Sean T. Higgins, SBN:266888          949-748-1000    949-315-3540
ANDREWS & THORNTON
2 Corporate Park Ste 110
Irvine CA 92606

DATE: 2/14/13                    Clerk, by G. Arce-Barraza          , Deputy
*(Fecha):*                        *(Secretario)*                     *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010)).*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [✓] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]          **SUMMONS**          Legal Solutions CA Plus          Code of Civil Procedure §§ 412.20, 465



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION**

CASE NUMBER: 37-2013-00034663-CU-PL-CTL    CASE TITLE:
Sparling vs. Usplabs LLC

<u>NOTICE:</u> All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
   (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
   (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), <u>and</u>
   (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

<u>Potential Advantages and Disadvantages of ADR</u>
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

<u>Most Common Types of ADR</u>
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at www.courtinfo.ca.gov/selfhelp/lowcost.

<table>
<tr><td colspan="2">

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

STREET ADDRESS:     330 West Broadway

MAILING ADDRESS:    330 West Broadway

CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827

BRANCH NAME:      Central

</td><td>FOR COURT USE ONLY</td></tr>
</table>

PLAINTIFF(S):    Leanne Sparling et.al.

DEFENDANT(S): Usplabs LLC et.al.

SHORT TITLE:    SPARLING VS. USPLABS LLC

<table>
<tr><td>

**STIPULATION TO USE ALTERNATIVE
DISPUTE RESOLUTION (ADR)**

</td><td>

CASE NUMBER:
37-2013-00034663-CU-PL-CTL

</td></tr>
</table>

Judge: Richard E. L. Strauss                  Department: C-75

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process. Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                ☐ Non-binding private arbitration

☐ Mediation (private)                        ☐ Binding private arbitration

☐ Voluntary settlement conference (private)     ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)             ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                Date: _____

_____                _____

Name of Plaintiff                        Name of Defendant

_____                _____

Signature                              Signature

_____                _____

Name of Plaintiff's Attorney            Name of Defendant's Attorney

_____                _____

Signature                              Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated: 02/14/2013              _____

                               JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 12-10)      **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**     Page: 1

3

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

| | |
|---|---|
| STREET ADDRESS: | 330 West Broadway |
| MAILING ADDRESS: | 330 West Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 450-7075 |

PLAINTIFF(S) / PETITIONER(S):  Leanne Sparling et.al.

DEFENDANT(S) / RESPONDENT(S):  Usplabs LLC et.al.

SPARLING VS. USPLABS LLC

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE | CASE NUMBER: 37-2013-00034663-CU-PL-CTL |
|---|---|

**CASE ASSIGNMENT**

Judge:  Richard E. L. Strauss                              Department: C-75

**COMPLAINT/PETITION FILED: 02/13/2013**

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 07/26/2013 | 10:15 am | C-75 | Richard E. L. Strauss |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS:  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except:  small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants, and a Certificate of Service (SDSC form #CIV-345) filed within 60 days of filing.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, each party demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) for each party on or before the date scheduled for the initial case management conference in the action.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

**NOTICE OF CASE ASSIGNMENT**



# Superior Court of California
# County of San Diego

# NOTICE OF ASSIGNMENT
# TO IMAGING DEPARTMENT

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website. This Program will be expanding to other civil courtrooms over time.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

# Please refer to the General Order - Imaging located on the San Diego Superior Court website at:

http://www.sdcourt.ca.gov/CivilImagingGeneralOrder

SHORT TITLE: Sparling, et al. v USPLabs, LLC, et al.     CASE NUMBER:

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[ ] Plaintiff     [X] Defendant     [ ] Cross-Complainant     [ ] Cross-Defendant

USPLABS, LLC,
JONATHAN VINCENT DOYLE (an individual),
JACOB GEISSLER(an individual),
USPLABS JACK3D, LLC,
USPLABS HOLDING, LLC,
GNC CORPORATION,
NATURAL ALTERNATIVES INTERNATIONAL, INC.,
and DOES 1-500, Inclusive,

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Legal
Solutions
℠ Plus

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Sean T. Higgins, SBN:266888<br>ANDREWS & THORNTON<br>2 Corporate Park Ste 110<br><br>Irvine CA 92606<br>TELEPHONE NO: 949-748-1000    FAX NO.: 949-315-3540<br>ATTORNEY FOR *(Name):* Plaintiff, Leanne Sparling, et al. | COPY<br><br>FEB 13 '13 AM10:11<br><br>BY FAX |

COPY

BY FAX

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego CA 92101
BRANCH NAME: Hall of Justice Courthouse

CASE NAME: Sparling, et al. v USPLabs, LLC, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 37-2013-00034663-CU-PL-CTL |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[X] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [X] Large number of separately represented parties    d. [X] Large number of witnesses
b. [X] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve    in other counties, states, or countries, or in a federal court
c. [X] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify):* 9
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 2/12/2013

Sean T. Higgins, SBN:266888
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

*Legal Solutions Plus*

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
            or wrongful eviction)*
    Contract/Warranty Breach—Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case—Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
        domain, landlord/tenant, or
        foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late
        Claim
    Other Civil Petition